Sylvia **CHASE**, Executrix of the Estate of Myron L. Chase, Stephen Chase, John A. Witte and Donjon Marine Co., Inc., Plaintiffs,

v.

**COLUMBIA NATIONAL CORPORATION, David Miller and James D. Larr, Defendants.**

No. 91 Civ. 3357 (RWS).

United States District Court, S.D. New York.

May 24, 1994.

Kelly & Roth, by William H. Roth, Esq. (of counsel), New York City, for plaintiffs.

Thompson, Hine and Flory, by Luke L. Dauchet, Esq. (of counsel), Cleveland, OH, Santora & Greenfield, New York City, for defendants.

## OPINION

SWEET, District Judge.

Plaintiffs Sylvia Chase, Executrix of the Estate of Myron Chase, Stephen Chase ("Chase"), John A. Witte ("Witte") and Donjon Marine Co., Inc. ("Donjon Marine") (collectively, the "Plaintiffs") sought in this diversity action to obtain payment for certain equipment sold to the defendants Columbia National Corporation ("Columbia"), David Miller ("Miller") and James D. Larr ("Larr") (collectively, the "Defendants"). The Defendants counterclaimed seeking damages for fraud and breach of fiduciary duty arising out of the purchase of stock in the Witte Chase Corporation ("Witte Chase") from certain of the Plaintiffs in 1987. Upon all the proceedings had herein and the following findings of fact and conclusions of law, judgment will be entered granting relief to Plaintiffs with costs and dismissing the counterclaims of the Defendants.

Certain of the Plaintiffs in 1987 sold a 50% interest in Witte Chase, one of the largest exporters of scrap metal in the United States, to the Defendants, who owned and operated one of the largest dealers in domestic scrap, Columbia. After almost two years of operation, the parties concluded that their joint enterprise was not working out, and in 1989 the assets of Witte Chase were sold to a third party, Hugo Neu & Sons, Inc. ("Hugo Neu"). The sale disclosed a significant discrepancy between the inventory accounts and the actual scrap on hand. An investigation was undertaken by the Defendants which disclosed certain accounting practices and conduct which caused them to believe that the 1987 contract of sale by which they had acquired their interest in Witte Chase had been violated, that the acts of the Plaintiffs and others had been fraudulent and a breach of fiduciary duty. A race to the courthouse ensued.

The events of 1986, 1987 and 1988 which surrounded the calculation of the scrap metal inventory on hand at Witte Chase were revealed. It turns out that the calculation of inventory for scrap metal is not as precise or as well understood as the parties, and particularly the Defendants, had assumed. The dispute vividly demonstrates the danger of assumption, particularly by persons with experience and training in the matters at hand. There was misunderstanding aplenty, but no fraud or breach of fiduciary duty, for the reasons set forth in greater detail below.

### Prior Proceedings

This action was initiated by the Plaintiffs in the Supreme Court of the State of New York after they had received a letter from counsel for the Defendants indicating an intention to litigate a controversy arising out of the transaction between the parties in 1987. It was removed to this court by the Defendants on May 16, 1991. The parties were represented by able counsel, and discovery proceeded appropriately. The Plaintiffs moved for summary judgment to dismiss the Defendants' counterclaims, a motion which was denied as reported in an opinion dated September 9, 1993. *See Chase v. Columbia National Corp.*, 832 F.Supp. 654 (S.D.N.Y. 1993).

Trial before the Court was commenced on April 18, 1994, and concluded on April 21, after hearing twelve witnesses and the introduction of a number of documents and depositions. Final submissions were made on April 29, and the matter was considered finally submitted at that time.

### Findings of Fact

Prior to 1986, Witte Chase, a New York corporation, purchased scrap metal and sold it principally overseas through its main operation at a yard at Port Newark. Witte Chase also maintained a small office in New York. It was owned fifty percent by Donjon Marine which in turn was owned by Witte, and fifty percent by Myron Chase.

Columbia, now known as Columbia National Group, is an Ohio corporation with its principal place of business in Cleveland, Ohio. Columbia is involved in steel-related businesses, including the buying and selling of scrap, principally domestic. Miller is Columbia's owner, Chief Executive Officer and President. Larr is Columbia's Vice President of Finance and Administration.

For several years prior to and including the fiscal year ending February 28, 1986, Witte Chase had employed the accounting firm of LaGuardia and Petrella to conduct an audit of its financial statements. The audit was performed on a consolidated basis, including the parent corporation as well as a wholly-owned subsidiary called Clean Ven-

ture, Inc. and an 85% owned subsidiary called Nicromet, Inc.

In performing audits on Witte Chase's financial statements, LaGuardia and Petrella reviewed the inventory account of Witte Chase, which was one of the significant assets of the company. The auditors accepted the company's use of the Perpetual Inventory Record ("PIR") as the measure of the quantity of inventory held by the company. In order to develop a level of confidence in the PIR maintained by the company, at the time of the audit the auditors took a walk through the scrap yard and consulted with William Schmeidel ("Schmeidel"), Vice President of operations.

The PIR was a running balance of the company's purchases and sales of scrap, maintained on a computer which was programmed to record automatically purchases and sales and to update the account accordingly. For example, if the company made a purchase of a quantity of scrap from a seller that used a barge to deliver the scrap, the company would record on the computer system the name of the seller, the number of the purchase order, the quantity purchased, the method of delivery, and the price. When delivery was made, the company would record the exact amount of the purchase. The PIR would then be increased by the computer to reflect both the additional tonnage and the average price of that commodity of scrap as shown on the company's records. Likewise, upon a sale of a commodity, the particular information about the contract of sale was recorded, and the computer recalculated the amount of inventory to reflect the sale.

The PIR also had a program that permitted "transfers and adjustments" to inventory. A transfer occurred if some portion of scrap already within Witte Chase's inventory was reclassified from one grade of scrap to another (some sixteen grades were classified) at which time a quantity was changed from one category to another and the PIR adjusted accordingly. An adjustment occurred if the company decided, for one reason or another, to change the amount of inventory shown in a particular commodity. For example, Witte Chase sometimes made negative adjustments in various inventory categories to reflect the

amount of dirt and debris that was likely included in the overall inventory weight. Adjustments also resulted when at the time of shipment on an ocean-going vessel to a foreign buyer, the invoice stated the weight of the cargo as measured and recorded at the time of loading and at its destination, the cargo was weighed again. The buyer and Witte Chase would adjust the invoice to reflect the weight as reported at the place of unloading, requiring reduction of the effect of the invoice on the PIR. In addition, as shipments were made, on occasion a greater proportion of high grade steel would be added ("sweetening") or the amount of low grade steel increased ("souring") which would also result in an adjustment which would be directed by Schmeidel, the manager of operations.

In 1986, the Chemical Bank, which was financing Witte Chase and its inventories, requested that it select new auditors of national stature. In August 1986, Witte Chase hired Oppenheim, Appel and Dixon ("OAD"), one of whose partners was then doing personal tax work for Myron Chase, to perform the audit for the fiscal year ending February 28, 1987. The individuals at OAD who worked on the Witte Chase audit did not have prior experience with scrap companies. During the course of their introduction to the business of Witte Chase and review of its papers and those of the predecessor accountants, it was noted that Witte Chase had significant overages in its inventory at the yard, that is, more inventory in the yard than was shown on the PIR, a condition which according to OAD partner in charge of the engagement could have adverse tax consequences.

In November 1986 Witte and Myron Chase asked the controller of Witte Chase, Bruce Hydo ("Hydo"), who was responsible for maintaining the PIR, to go back and review all of the shipments of cargo to buyers and to identify the amount of receivables written off by vessel.

In August 1986, Miller, a longstanding friend of Myron Chase, accompanied by Columbia's Chief Operating Officer, Ronald Bone ("Bone"), visited Myron Chase and talked with Witte about the potential purchase of an interest by Columbia in Witte Chase. Again in the fall of 1986, the owners of Witte Chase discussed with Miller the possible investment by Columbia in Witte Chase, discussions which continued through the spring of 1987. On behalf of the then shareholders of Witte Chase, it was represented that the net worth of Witte Chase was between $2–3 million.

During the last week of its fiscal year, Witte Chase was processing the sale of scrap to be shipped on an ocean-going vessel called the Ocean Wind. Loading of the ship commenced at the Port Newark yard during the last week of February but was not completed until the first week of March. In order to complete its fiscal year, on Saturday, February 28, 1987, Witte Chase's Port Newark Division issued a provisional invoice for "shipments through 2/28/87." The invoice was in the amount of $1,797,872.44, and reflected the amount of scrap loaded on the Ocean Wind as of the end of the company's fiscal year.

The provisional invoice was recorded as a sale on Witte Chase's Sales Journal for February 1987 in the amount of $1,896,703.79. As a result, the sale became an account receivable of the company and was included as an asset in the financial records at the close of the fiscal year ending February 28, 1987.

In accordance with its customary practice, the reduction of its PIR to reflect the cargo on the Ocean Wind was postponed until March 6, 1987, the date the ship sailed, which was in the company's next fiscal year. As a result, the company's financial records at the end of February 28, 1987 showed both an account receivable in the amount of the provisional invoice and a PIR which had not been reduced by that invoice.

A Purchase Agreement between the parties (the "Purchase Agreement") was reached and dated April 10, 1987, based upon the net worth of Witte Chase at the close of its fiscal year. Myron Chase and Donjon Marine each sold one-half of their shares in Witte Chase to Columbia. Immediately after the sale, Chase and Donjon each owned 25% of the shares of Witte Chase. Columbia owned

50%. Certain miscellaneous business assets of Witte Chase were spun out of Witte Chase at the time of the sale of the 50% interest to Columbia.

The Purchase Agreement provided that:

(a) Columbia paid $1,000,000 to each of Chase and Donjon at the time of the closing and delivered to each of Chase and Donjon a promissory note in the amount of $250,000.00, payable one year from the date of purchase;

(b) Chase and Donjon "guaranteed" that the net worth of Witte Chase (absent the unrelated business assets referred to in ¶ 2, above) was at least $2,350,000.00 as of February 28, 1987, the end of the Witte Chase fiscal year. In the event that the net worth of Witte Chase was less than that amount, Chase and Donjon obligated themselves to contribute cash to Witte Chase in an amount equal to the difference between Witte Chase's net worth and $2,350,000;

(c) The Agreement provided a procedure for determining whether the net worth (or Shareholder's equity) exceeded $2,350,000:

(i) In the first instance, Witte Chase's certified public accountants, OAD, prepared what was known as the "Hypothetical Financial Statement" for Witte Chase as of February 28, 1987. The term "Hypothetical Financial Statement" refers to the Financial Statement of the steel scrap operations of Witte Chase, had the unrelated business assets been spun off as of February 28, 1987. OAD was to prepare such financial statement in accordance with generally accepted accounting procedures.

(ii) Arthur Andersen & Co., ("Arthur Andersen"), Columbia's certified public accountant, was to conduct a review of Witte Chase's books and records in order to satisfy itself that the Hypothetical Financial Statement did not contain misrepresentations or material omissions.

(iii) In the event that Arthur Andersen discovered any misrepresentations or material omissions in the Hypothetical Financial Statement, it was to submit a report of its findings to Chase and Donjon;

(iv) In the event that Arthur Andersen challenged the accuracy of the Hypothetical Financial Statement, Chase and Donjon had 30 days to respond to such report to convince Arthur Andersen of the accuracy of the Hypothetical Financial Statement. In the event Chase and Donjon, on the one hand, and Arthur Andersen, on the other, were unable to agree on the financial condition of Witte Chase, Columbia had two years from the date of closing to make any claim with respect to the financial condition of Witte Chase as of February 28, 1987.

Myron Chase died May 1, 1987, three weeks after the sale of a 50% interest in Witte Chase. Thereafter, his son, Stephen H. Chase, looked after the estate's interest in Witte Chase and functioned as an officer of the company.

OAD prepared the Hypothetical Balance Sheet and presented it to the parties in June 1987. The Hypothetical Balance Sheet reflected that as of February 28, 1987, Witte Chase had assets of approximately $15 million and liabilities of approximately $12.7 million resulting in net worth of $2,354,549.

Specifically, OAD determined and later certified in financial statements issued for Witte Chase that the inventory value of Witte Chase as of February 28, 1987 was $6,333,835. OAD calculated the inventory by adopting a physical survey produced by Peter Kelman & Co. ("Kelman") of the scrap stockpiled at the Witte Chase yard. The survey was conducted by employees of Peter Kelman and Steven Shinn ("Shinn"). As a result of normal business operations, the scrap was segregated into different grades of metal. Shinn and Peter Kelman measured the size of each pile, and applying accepted values which determine the weight of scrap within a particular volume, they calculated the size, the weight of each of the different grades of scrap and reduced this calculation to a written report. From the amount calculated by Shinn, OAD deducted 2% of its weight, in accordance with usual scrap accounting practices, to reflect the dirt that is

mixed in with the steel scrap. The Kelman survey stated, by a method said to be accurate to within one tenth of one percent, 963.2 tons of HMS # 1 scrap in inventory as of February 28, 1987, whereas the PIR would have shown only 137 tons. The inventory contained reservations as to its accuracy.

OAD took the net weight and multiplied it by the cost of the scrap to arrive at gross value of the scrap. To this OAD added scrap that was stockpiled at another Witte Chase location (at which Shinn made a similar physical inventory) and scrap which had been purchased by Witte Chase prior to February 28, 1987, but which was aboard barges as of that date. From this total, OAD subtracted the value of scrap that was on-site at the Witte Chase yard but which had been sold, but not yet delivered, to other customers. After making all these calculations, OAD arrived at an interim inventory total of $5,319,090. From this, an adjustment was made to reflect the differential between LIFO valuation and "base year cost" to reflect that for accounting purposes the inventory was valued at $5,480,158.

To this OAD added the sum of $853,677 representing the stainless steel inventory of an 85% subsidiary of Witte Chase. OAD arrived at a total value of Witte Chase inventory in the amount of $6,333,835. For purposes of this action, OAD's Hypothetical Financial Statement reflected that there was $5,480,158 of non-stainless steel scrap in the inventory as of February 28, 1987.

After the Purchase Agreement had been entered into, in May 1987, Larr went to the Port Newark facility to review the operations and to meet with representatives of the company, including Hydo. Larr asked Hydo about the business that had been conducted since March 1, 1987, the effective date of Columbia's purchase. Hydo told Larr about the business to date, including the Ocean Wind transaction. Hydo told Larr that a major portion of the Ocean Wind sale had been recorded as a receivable as business conducted in the prior fiscal year. Larr requested and received a copy of the opening inventory of the PIR for the 1988 fiscal year, showing a total inventory of 126,659.01 tons. Hydo did not tell Larr that the inventory

that corresponded to the invoiced portion of the Ocean Wind transaction had not been relieved from the inventory records as of March 2, the date of the inventory report.

In or about late June 1987, OAD presented to Columbia and Arthur Andersen a draft Hypothetical Financial Statement which included the calculation that the inventory value of Witte Chase was $6,333,835, comprised of $5,480,158 of non-stainless steel scrap and $853,677 of stainless. All the OAD calculations, assumptions and adjustments were made available to Columbia in June 1987. On June 25 and June 26, 1987, an auditor from Arthur Anderson, Russell Gates, Larr, and personnel from OAD met to discuss the method of preparation of the Hypothetical Financial Statement and reviewed the OAD audit and workpapers.

Larr and Gates asked about the Ocean Wind transaction and were told by OAD that OAD had reviewed the company's accounting of the transaction. OAD summarized the conversation in a memo, stating as follows:

> A question arose as to the reason for recording the sale and receivable and reduction of inventory for the amount of inventory aboard the "Ocean Wind" as of February 28, 1987. We [OAD] inspected the contract that specified order was F.O.B. ship, and therefore was proper to include the sale even though the complete shipment had not yet been loaded.

Larr and Gates reviewed the OAD inventory premised on a physical observation of the scrap yard, a premise which Larr and Gates recognized as somewhat unusual given the obvious difficulty of making an accurate assessment of the quantities of scrap without actually weighing the inventory. The physical inventory was listed on a worksheet contained in OAD's workpapers, and stated that PIR did not include the amounts shipped on the Ocean Wind. Because the physical inventory closely approximated the March 2 opening balance of the PIR for fiscal 1988, Larr and Gates accepted OAD's use of the physical inventory as a basis for their opinion about the inventory. The PIR of March 6 giving effect to the Ocean Wind transaction was not examined.

The net worth of the company, as certified by OAD, was $2,354,549, slightly in excess of the amount guaranteed in the Purchase Agreement.

Sometime after February 28, 1987, Hydo made a number of analyses of the inventory account at Witte Chase. One study listed the tonnages on the PIR at the end of the fiscal year and showed deductions for the quantities loaded on the Ocean Wind. This paper was not provided to Larr or to the auditors. Another study compared the tonnages on the foregoing exhibit with the amounts shown on the physical inventory relied upon by the auditors and was described as the inventory "overages" at Port Newark. Another study related to the amount of cargo written off as a consequence of adjustments reached with respect to shipments made by the company in prior years.

Hydo was advised by OAD that the PIR should be adjusted to eliminate overages. Sometime after February 27, 1987, Hydo listed the vessel write-offs and tried to recreate the amount of tonnage that was the subject of the write-offs on those vessels. He picked quantities in round numbers, assigned a value, and then completed the cargo by calculating the final category necessary to produce the end result. None of the overage analysis was shared with Larr or Miller, including any justification for increasing the inventory account.

During the fiscal year following the effective date of Columbia's investment in Witte Chase, there were a number of adjustments to increase the PIR. All of the adjustments were summarized in a monthly sheet called Month to Date Transfers and Adjustments. This was a summary sheet created by the computer to total the adjustments made, by commodity, during the preceding month by individual entries into the computer system. Some of the records showing those entries are still available; others have been destroyed.

There were three categories of adjustments to the inventory account, made during the fiscal year. The first category was adjustments made in the ordinary course of the business; these were, for the most part, relatively small and include both positive and negative adjustments similar to the types of adjustments that were made during the prior fiscal year.

The second category consists of adjustments which were increases in the inventory records to reflect the scrap purchased by Witte Chase from its former subsidiary, Justify Steel, Inc. These quantities were located at a separate scrap yard; because they were purchased as part of the agreement in which Columbia invested in Witte Chase, the quantities were not recorded in the normal fashion.

The final category of adjustments consisted of a series of positive increases to the inventory records. These total 21,759 tons, and were made from July 1987 through February 1988. The quantities are frequently in rounded numbers (e.g., 4500 tons, 1000 tons), and were based upon hand-written memoranda from Schmeidel.

Neither Larr nor anyone else at Columbia was told about the inventory write-ups during the 1988 fiscal year, but Larr had access to the PIR, including the monthly transfer and adjustment record.

After Myron Chase died, the business relationship between Donjon Marine, Witte, and Chase on the one hand and Columbia and its officers responsible for overseeing its investment in Witte Chase, on the other hand, deteriorated. Witte Chase suffered a loss in fiscal year ending February 28, 1988. Eventually the parties decided that a workmanlike partnership was not possible to achieve, and in 1989 the principals of Witte Chase decided to sell the company. Witte and Chase, with the approval of Columbia, negotiated the sale of the business to Hugo Neu. The proposed sale was to cover most but not all of the assets of Witte Chase.

In order to make the sale, the principals reorganized Witte Chase, separating the assets to be retained from the business to be sold to Hugo Neu. The principals formed a new corporation called WCC Holdings, Inc. ("Holdings"). They contributed their shares of Witte Chase to Holdings, making Witte Chase a subsidiary of Holdings. They also created another subsidiary of Holdings called New Sub, Inc. They then caused Witte

Chase to transfer the assets that were not going to be the subject of the purchase by Hugo Neu, including the scrap inventory at the Port Newark yard, to New Sub, Inc.

Hugo Neu bought the shares of Witte Chase from Holdings on June 6, 1989. After the purchase, Witte Chase bought the inventory of scrap held by New Sub, Inc. The "new" Witte Chase (now a Hugo Neu owned entity) purchased the inventory in three segments. The first portion, consisting of all but three grades of scrap, was bought on June 6, 1989. For these grades of scrap the Hugo Neu entity on the one hand and the parties, here, on the other hand, agreed to accept the quantities and values reported on Witte Chase's PIR.

The second portion of scrap, consisting of two grades of scrap in New Sub, Inc.'s inventory, was purchased in August 1989. The "new" Witte Chase paid New Sub, Inc. for these two categories of scrap only after the categories had been weighed. The two categories purchased according to weight were # 1 HMS and # 2 HMS.

At the time each of these categories was weighed for sale, there was a deficit between the amount shown on the June 6, 1989 PIR and the amount determined by weight. Those deficits were:

| Category | Amount as Recorded on Internal Inventory Record | Actual Weight | Difference |
|----------|------------------------------------------------|---------------|------------|
| # 1 HMS | 12,112 GT | 7,698.9 GT | − 4,413.1 |
| # 2 HMS | 10,857 | 9,367.2 | − 1,500.8 |

Between June 6, 1989 and the time the quantities were weighed, there were no sales or disposition of scrap by New Sub, Inc.

On June 6, 1989, the PIR of Witte Chase showed the following average per ton values for these categories of scrap:

| | |
|---|---|
| # 1 HMS | $105.893 |
| # 2 HMS | $ 96.025 |

At the time of the sale of the Witte Chase's business in 1989, there was a deficit in the inventory of the business. The category of scrap called Municipal was shown on the books of the company as including over 16,-000 tons. When the scrap was sold, there were only 8362 tons of Municipal. Losses were also reported in the HMS # 1 and HMS # 2 categories.

During the months preceding the liquidation, Witte Chase made a series of transfers of commodities from other categories to Municipal. These transfers retained the total tonnages and values of the inventory in the PIR but reclassified the tonnages as Municipal. When the loss was reported in 1989, the loss was not a loss of tonnages based upon the original purchases as Municipal but the combination of other categories of scrap, which had been transferred to Municipal.

However, with one exception, not in dispute, the municipal scrap was not purchased by the Hugo Neu entity that purchased Witte Chase in June 1989, and, accordingly, Witte Chase's entire holding of municipal scrap was never weighed, nor was its weight estimated for purposes of comparing it to the amounts listed in computerized inventory records.

New Sub, Inc., created for liquidation and tax purposes, but otherwise identical to Witte Chase in respect of ownership, sold a computer and a crane to Columbia for $10,000 and $75,000, respectively. Delivery of the crane and computer were made. Notwithstanding demand, Columbia failed to pay the $85,000 due and owing for such material.

**Conclusions of Law**

Diversity jurisdiction exists pursuant to 28 U.S.C. § 1345.

***The Relief Sought by the Complaint is Appropriate***

The complaint contains only one money claim, arising from Columbia's failure to pay for the $75,000 crane and a $10,000 computer purchased from a successor to Witte Chase (variously called New Sub, Inc., or the Witte Chase Liquidating Trust), in which Plaintiffs have a 50% interest. In the Pretrial Order it has been stipulated that the full sale price is

now due and owing. (Pretrial Order at 2, § 3(a), and 8, ¶ 18). Judgment, therefore, should be entered granting Plaintiffs' claim for damages based upon the sale price of $85,000, with costs and interest since June 1989.

### The Inventory Adjustments Were Not Fraudulently Concealed

■ The facts as found above reveal that there was indeed a misunderstanding surrounding the interrelationship of the PIR and physical inventory in the months following the execution of the Purchase Agreement. Larr, mistakenly relying upon the opening balance of the PIR of March 2, unrelieved by the Ocean Wind transaction, concluded that the PIR was substantially the same as the physical inventory on which the Defendants relied in accordance with the Purchase Agreement. He testified that had he known the effect that the Ocean Wind transaction had on the PIR as reported on March 6, he would have raised questions which would have resulted in a resolution of the issue of the net worth of Witte Chase during the two years following the execution of the Purchase Agreement. He did not, because neither he nor Arthur Anderson knew the procedures for billing and accounting as they affected the PIR with respect to the Ocean Wind transaction. In response to a direct question, he was told that the accounting for the transaction was appropriate, as indeed it was. What he did not know, and was not told, was that the procedures followed invalidated the assumptions that he had made.

Larr's assumption might well have been corrected during the fiscal year following the Purchase Agreement had not adjustments been made, the announced purpose of which was to reduce the overages, the chronic problem that had been noted prior to the execution of the Purchase Agreement. It is the position of the Defendants that these adjustments, which had the effect of masking the prior misapprehension, were part of a deliberate effort at concealment amounting to fraud. However, there is no direct evidence in this record to that effect. Such a conclusion can be reached only by inference.

In support of such an inference is the undeniable fact that as events unfolded the accounting treatment did not place Larr or Columbia on the sort of notice that might have permitted them to seek renegotiation of the Purchase Agreement, obviously a consequence which benefitted the Plaintiffs. Offsetting such an inference, however, is the direct testimony of Witte, Schmeidel, and Chase, all of whom are credible and deny any intention to conceal anything at any time. Hydo testified that he was acting at the recommendation of OAD, the partner of which confirmed his advice to Hydo. The requirement that the Defendants prove their contentions by clear and convincing evidence thus becomes an insuperable barrier to their recovery. See Katara v. D.E. Jones Commodities Inc., 835 F.2d 966, 971 (2d Cir.1987) (each element of fraud must be established by clear and convincing evidence).

Viewed from the perspective most favorable to the Defendants, the facts establish at best a negative, that is, that Columbia was not advised of facts which might have caused it to have pursued a different course. Such a negative does not meet the Defendants' burden with respect to fraudulent concealment.

### There Was No Breach of Fiduciary Duty

■ In the light of the authorities, there is no doubt but that the partners in the enterprise which was Witte Chase owed one another a fiduciary duty. See, e.g., Rosiny v. Schmidt, 185 A.D.2d 727, 587 N.Y.S.2d 929, 937 (1st Dep't 1992); Benson v. RMJ Secur. Corp., 683 F.Supp. 359, 375 (S.D.N.Y.1988); In re T.J. Ronan Paint Corp., 98 A.D.2d 413, 469 N.Y.S.2d 931, 936 (1st Dep't 1984). Again, however, the evidence adduced by the Defendants fails to establish a knowing breach of that duty.

There was no evidence of a conscious effort to conceal the adjustments to the PIR, just that the adjustments were not highlighted. In fact, as noted above, Larr and Columbia had access at all time to the records which were being adjusted. The adjustments at the time were viewed as housekeeping, a "tidying up" to synchronize the PIR and the physical inventory. Indeed, it was OAD that made the determination to reach an asset determination through a physical inventory, rather than by using the PIR. Nothing in the record supports the conclusion that OAD's decision was not made in good faith.

However, the adjustments were not made at one time as a pure accounting adjustment, and this fact is relied upon by the Defendants to constitute evidence of a deliberate breach of duty. Despite this contention, no evidence was adduced that making a series of corrections as opposed to one balancing entry violated any accounting standards or practices, and Schmeidel advanced a coherent explanation for the manner in which the adjustments were made. Against the infer-. ence sought to be established by the Defendants is the uncontroverted fact that Columbia had free and unfettered access to the Witte Chase records during the entire period, and the records themselves are the sole basis for the Defendants' counterclaims.

No authority has required bookkeepers to report all entries to all partners when the results of those entries were made evident. Indeed, a closer review of the losses for fiscal year 1988 of the kind that Columbia ultimately undertook would have revealed all the facts recited above during the period before the self-imposed statute of limitations had run.

Finally, even if a breach of duty were established by these facts, which it has not been, the problem of remedy remains. Had the statute of limitation been tolled by such an hypothetical breach of duty, there still would remain only the opportunity to challenge the valuation with its consequent guarantee. This record fails to establish that the PIR was more correct than the physical inventory at the time of the Purchase Agreement. Even if the Defendants had been able to seek damages on the guarantee, the amount of any such damages have not been established.

There is neither a breach of fiduciary nor the elements of such a cause of action.

*Conclusion*

Judgment will be entered on the complaint with costs and disbursements and the counterclaims are dismissed.

It is so ordered.