**Sylvia CHASE, Executrix of the Estate of Myron L. Chase, Stephen Chase, John A. Witte and Donjon Marine Co., Inc., Plaintiffs,**

v.

**COLUMBIA NATIONAL CORPORATION, David Miller and James D. Larr, Defendants.**

**No. 91 Civ. 3357 (RWS).**

United States District Court, S.D. New York.

Sept. 9, 1993.

Kelly & Roth, New York City, for plaintiffs (William H. Roth and Lisa A. Frey, of counsel).

Thompson, Hine and Flory, Cleveland, OH (David J. Hooker, of counsel) and Santora & Greenfield, New York City, for defendants and counterclaimants.

## OPINION

SWEET, District Judge.

Plaintiff Sylvia Chase ("Chase") has moved for partial summary judgment pursuant to Rule 56(b), Fed.R.Civ.P., dismissing the First through Sixth counterclaims of Defendant Columbia National Corporation ("Columbia"), now known as Columbia National Group, Inc., on the ground they are barred by a contractual provision agreed upon by the parties. For the reasons set forth below, the motion is denied.

### The Parties

The Plaintiff is a resident of the State of New York and the widow and executrix of the estate of Myron Chase (the "Chase Estate"). The Witte Chase Corporation ("Witte Chase") was a corporation organized under the laws of New York with its principal place of business in New York City, but which maintained its scrap metal yard in New Jersey at Port Newark (the "Port Newark facility"). Witte Chase was run by Myron L. Chase ("Myron Chase") until his death on May 1, 1987. John A. Witte ("Witte"), a resident of New Jersey, is the President of Witte Chase and of Donjon Marine Co., Inc. ("Donjon"), a New Jersey corporation which owned a half or quarter interest in Witte Chase from 1981 until 1989.

Columbia is a corporation organized under the laws of Ohio with its principal place of business in Cleveland, Ohio. Defendant David Miller ("Miller") is the President of Columbia and Defendant James D. Larr ("Larr") is Vice–President and Chief Financial Officer of Columbia. Jurisdiction over this action is based upon diversity of citizenship between the parties.

### Prior Proceedings

The Plaintiff originally filed her complaint in New York State Court seeking a declaratory judgment of her rights, allegedly in response to letters from counsel for Columbia threatening a lawsuit. Copies of her summons and complaint were received by Columbia, Miller and Larr on April 17, 1991. Columbia removed the action to federal court and filed an amended answer and six counterclaims on August 28, 1991.

Columbia alleged in its first amended counterclaim that in April of 1987 Donjon and Myron Chase intentionally overstated the book value of Witte Chase by over a million dollars in order to induce Columbia to purchase its interest in Witte Chase at an artificially inflated price. Columbia alleged in its second amended Counterclaim that Donjon and the Chase Estate made systematic upward adjustments to the Witte Chase inventory records to conceal the overstatement of the Witte Chase book value relied upon by Columbia in its acquisition of Witte Chase stock. The remaining four amended counterclaims allege misrepresentation, breach of fiduciary duties, and breach of a duty of reasonable care arising from the same facts. Columbia also alleged a seventh counterclaim of appropriating business opportunities properly belonging to Witte Chase for the benefit of other companies affiliated with Donjon and the Chase Estate and brought an eighth counterclaim in its capacity as shareholder alleging a derivative claim on the part of Witte Chase for this misappropriation.

Chase filed her motion to dismiss all but the last two counterclaims on April 29, 1993. The motion was argued on June 2, 1993, and was considered fully submitted as of that date.

### The Facts

Witte Chase engaged primarily in the purchase and export sale of scrap metal, purchasing and selling approximately 600,000 tons of steel scrap per year in the mid–1980's, with annual sales of approximately $50 million dollars. Witte Chase was wholly owned by Myron Chase until Donjon, a company which owns and manages barges and other marine equipment used in the transport of steel scrap, purchased a 50% interest in it in 1981. Chase alleges that Donjon had been transporting scrap for the Newark Port facility since approximately 1977.

In March, 1987, Columbia, also a scrap-metal company, began to exchange drafts of a final purchase agreement for a stake in Witte Chase. On April 10, 1987, Columbia, Myron Chase, and Donjon entered into a written Stock Purchase Agreement (the "Stock Purchase Agreement" or "Agreement") in which Columbia (the "Purchaser") acquired 50% of Witte Chase Corporation's stock, half from the shares held by Donjon and half from those held by Myron Chase (collectively, the "Sellers") for $2,500,000.00. Because Witte Chase's fiscal year ended in February, Columbia agreed to purchase its interest based on the value of the Company as of February 28, 1987, and once the transaction closed on April 10, 1987, Columbia owned its fifty percent interest as of February 28, 1987.

Section 10 of the Agreement provided for both Witte Chase's accountants and Columbia's accountants to review the financial statements provided by Witte Chase and to prepare and certify the company's financial statements in June, 1987,[1] "in order to satisfy themselves that the financial statements of [Witte Chase] for the year ended February 28, 1987 . . . do not contain misrepresentations or omissions." Section 10 further provided that if there were "untrue matters" or "omissions" which would have a material "adverse impact on the company's financial position", then Columbia as Purchaser had "the right to take such action or seek such remedies as may be available to it under the law, subject to the provisions set forth in Section 11 hereof."

In Section 11(b), the Sellers guaranteed to the Purchaser that the net worth of the Company (Witte Chase) as sold to Columbia would be at least $2,350,00 as of February 28, 1987, or else Columbia would be permitted a credit on its purchase price. Sections 11(b)(iv) and (v) provide:

> (iv) In addition, if any representation or warranty contained herein . . . should prove to be untrue, of [sic] if Sellers should

---

1. The parties referred to this as the "Hypothetical financial statement," because it was to reflect the financial condition of Witte Chase as though it has spun off certain assets which were not included in the sale to Columbia because Columbia was only interested in purchasing a share in

Witte Chase's scrap business. The June statements were designed to reflect the precise financial status of that portion of Witte Chase that Columbia was purchasing as of February 28, 1987.

breach any covenant herein, and if the Shareholders Equity ... would have been less than $2,350,000 ... then Sellers will pay to the company such difference.

(v) In addition to the foregoing, if any representation or warranty contained herein should prove to be untrue, or if Sellers should breach any covenant herein ... and such breach (aa) does not reduce the Shareholder Equity .. but would, under generally accepted accounting principles, require footnote disclosure and (bb) would reduce the fair market value of the Company, then Sellers shall indemnify the Purchaser for any loss occasioned thereby....

Section 11(b) also provides that "[any claim brought pursuant to this Section 11(b)(iv) and (v) must be made prior to the second anniversary of closing," which took place on April 9, 1989.

One of the main assets of Witte Chase was its inventory, and the principal record of the amount of scrap metal in the year was the perpetual inventory record maintained by Witte Chase. In the course of negotiations, Columbia was provided with a Witte Chase inventory record as of February 28, 1987, including a perpetual inventory statement dated March 2 (the "March 2 Inventory Statement") which indicated that Witte Chase had 126,659 tons of scrap as of the close of its 1987 fiscal year at its Port Newark facility. In May 1987, after the execution of the Agreement, Larr visited the Port Newark facility and was informed that the provisional sale of approximately 80% of the final cargo of a vessel referred to as the *Ocean Wind* (the "Ocean Wind Cargo Sale") had been made before the end of the fiscal year ending February 28, 1987, and the account receivable reflecting the sale of. the vessel's cargo appeared in Witte Chase's fiscal records for 1987, not for 1988.

Columbia reviewed Witte Chase's financial statements after these had been prepared in June, 1987, by both Witte Chase's accountants and Columbia's accountants pursuant to the Agreement. Columbia states that it appeared then that the inventory recorded as of the close of Witte Chase's 1987 fiscal year, including the March 2 Inventory Statement, did not include the scrap loaded on the Ocean Wind. Since the Ocean Wind Cargo Sale was reflected as an account receivable, neither Larr nor Miller raised any further questions about it.

The Board of Directors of the new Witte Chase board consisted of four members, Larr, Miller, Witte and Myron Chase. Stephen Chase replaced Myron Chase after his unexpected death in 1987. After two years of joint management characterized by considerable dissention between Witte and the Chases on one hand and Larr and Miller on the other,[2] the decision was made to sell the company. Accordingly, all the assets of Witte Chase were eventually sold to a subsidiary of Hugo Neu and Sons Inc. ("Hugo Neu"), another dealer in scrap metal, in a series of transactions which closed during June of 1989. Hugo Neu relied partly upon Witte Chase's perpetual inventory record, but Hugo Neu also independently weighed certain grades of the scrap by loading it onto trucks, weighing the trucks, and then dumping the scrap back into the yard. Columbia alleges that Hugo Neu found an unexplained shortfall of $1,354,447 in the value of inventory equivalent to 13,877 tons of scrap metal between what was on Witte Chase's books and that measured by Hugo Neu. Chase, however, alleges that Hugo Neu found a discrepancy of only 4,563.8 tons, reflecting 4,413.1 fewer tons of No. 1 HMS scrap and 1,500.8 fewer tons of No. 2 HMS scrap, but 1,350.1 more tons of municipal scrap than was reflected in Witte Chase's inventory records.

Columbia alleges that by examining the records of the Port Newark facility for the years 1986 through 1989, it uncovered a scheme to defraud Columbia at the outset of its investment: although Witte Chase immediately included the Ocean Wind cargo sale in its accounts receivable on the last day of Witte Chase's 1987 fiscal year (the day on which the cargo was actually loaded), Witte Chase did not reduce its inventory until ap-

**2.** Chase asserts that disputes led to the signing of no fewer than four "accord and satisfaction" agreements between the principles of Witte Chase during the approximately two years of co-ownership.

proximately a week later, on March 6. In short, Columbia alleges that when Columbia purchased Witte Chase, the assets of Witte Chase (including its 126,659 tons of inventory), were overstated by 23,360 tons of inventory which appeared both in account receivables in the amount of $1,676,027 (booked as the Ocean Wind cargo sale), and as inventory worth $1,452,058. During Witte Chase's next fiscal year, ending February 29, 1988, there were several "adjustments" made to Witte Chase's inventory. Columbia alleges these were made to minimize the perpetual inventory shortfall created in fiscal 1988 by recording the inventory deduction for the Ocean Wind cargo sale on March 6, during Witte Chase's 1988 fiscal year.

## Discussion

### I. *Standard for Summary Judgment*

A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Silver v. City Univ. of New York*, 947 F.2d 1021, 1022 (2d Cir.1991). The Second Circuit has repeatedly noted that "[as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 n. 2 (1986) (Brennan, J., dissenting) and *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)); *see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York*, 716 F.2d 982, 983–84 (2d Cir.1983); *Mayer v. Morgan Stanley & Co.*, 703 F.Supp. 249, 251 (S.D.N.Y.1988). If, when "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder*

*v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991).

### II. *Statute of Limitations*

 Section 14 of the Agreement states, and the parties agree, that their dealings with each other are governed by New York law. In New York, the statute of limitations for breach of contract requires that the action accrues at the time of breach and must be commenced within six years of it (N.Y.C.P.L.R. § 213(2)); *John J. Kassner & Co. v. City of New York*, 46 N.Y.2d 544, 550, 415 N.Y.S.2d 785, 788, 389 N.E.2d 99, 102 (1979). An action for fraud must be commenced within six years of the commission of the fraud or within two years from its discovery, whichever is longer (N.Y.C.P.L.R. § 213(8); N.Y.C.P.L.R. § 203(g)).

 Parties to a contract may limit the statute of limitations for breach of contract if they so chose, for N.Y.C.P.L.R. § 201 provides:

> An action ... must be commenced within the time specified in this article unless a different time is prescribed by law or a shorter time is prescribed by written agreement. No court shall extend the time limited by law for the commencement of an action.

Agreements limiting the time in which an action can be brought are viewed cautiously and construed strictly against the party invoking the shorter period. *Backus v. Nationwide Mut. Ins. Co.*, 56 A.D.2d 724, 392 N.Y.S.2d 765, 766 (4th Dep't 1977); *Stanley R. Benjamin, Inc. v. Fidelity & Cas. Co. of New York*, 72 Misc.2d 742, 340 N.Y.S.2d 578 (Sup.Co.1972); *Bologna v. N.M.U. Pension Trust*, 654 F.Supp. 637, 639 (S.D.N.Y.1987). A shortened time period will be upheld if it is reasonable and voluntarily agreed to, *Kassner*, 46 N.Y.2d at 550, 415 N.Y.S.2d at 789, 389 N.E.2d at 103 (time-to-sue of six months from filing of certificate according to city contract reasonable); *Par Fait Originals v. A.D.T. Sec. Systems, Inc.*, 184 A.D.2d 472, 586 N.Y.S.2d 2 (1st Dep't 1992) (one year period reasonable); *Diana Jewelers of Liverpool, Inc. v. A.D.T. Co.*, 167 A.D.2d 965, 562 N.Y.S.2d 305 (4th Dep't 1990) (same); *Wayne Drilling & Blasting, Inc. v. Felix Indus., Inc.*, 129 A.D.2d 633, 514 N.Y.S.2d

114 (2d Dep't 1987), although the intention to establish a shorter period must be clearly set forth, *Hurlbut v. Christiano*, 63 A.D.2d 1116, 1118, 405 N.Y.S.2d 871, 873 (4th Dep't 1978); *Stanley R. Benjamin, Inc.*, 72 Misc.2d at 744, 340 N.Y.S.2d at 579–80; *Raymond Int'l, Inc. v. City of New York*, 511 F.Supp. 773, 776 (S.D.N.Y.1981).

## A. *Columbia's Fraud Claim*

■ In the case at bar, Chase alleges that Columbia is trying to pass off a simple claim for breach of contract as a fraud in the inducement claim in order to avoid the two-year limit on the time to sue under Section 11 of the Agreement. A cause of action for fraud will not arise when the only fraud charged relates to a breach of contract. *Scally v. Simcona Elec. Corp.*, 135 A.D.2d 1086, 523 N.Y.S.2d 307, 308 (4th Dep't 1987); *Trusthouse Forte (Garden City) Mgt., Inc. v. Garden City Hotel, Inc.*, 106 A.D.2d 271, 483 N.Y.S.2d 216, 218 (1st Dep't 1984); *Freyne v. Xerox Corp.*, 98 A.D.2d 965, 470 N.Y.S.2d 187, 188 (4th Dep't 1983); *Regnell v. Page*, 54 A.D.2d 540, 387 N.Y.S.2d 253 (1st Dep't 1976); *Value Time, Inc. v. Windsor Toys, Inc.*, 700 F.Supp. 6, 7 (S.D.N.Y.1988).

■ While New York law recognizes a cause of action for fraud in the inducement of a contract, this claim cannot be based solely upon the failure to perform the promises of future acts which constitute the contractual obligations themselves. *Vanderburgh v. Porter Sheet Metal, Inc.*, 86 A.D.2d 688, 446 N.Y.S.2d 523, 525 (3rd Dep't 1982); *Wegman v. Dairylea Cooperative, Inc.*, 50 A.D.2d 108, 113, 376 N.Y.S.2d 728, 734 (4th Dep't 1975); *Value Time*, 700 F.Supp. at 7; *Cranston Print Works Co. v. Brockmann Int'l A.G.*, 521 F.Supp. 609, 614 (S.D.N.Y.1981). If it were otherwise, "every breach of contract would constitute a tort, as every breach, if unauthorized, is wrongful," *Mayer*, 703 F.Supp. at 253.

■ Any breach of contract claim brought by Columbia based upon the Sellers' guaranty of the value of Witte Chase, including the value of its inventory as of the close of its 1987 fiscal year, is time-barred by Section 11(b)(iv) and (v) of the Agreement. However, Columbia's counterclaims make out a cause of action for fraud in the inducement, not for breach of the express warranties and representations in the Agreement. Under New York law,

> To maintain an action based on fraudulent representations, whether it be for the rescission of a contract or, as here, in tort for damages, it is sufficient to show that the defendant knowingly uttered a falsehood intending to deprive the plaintiff of a benefit and that the plaintiff was thereby deceived and damaged.... Accordingly, one "who fraudulently makes a misrepresentation of ... intention .. for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction" is liable for the harm caused by the other's justifiable reliance upon the misrepresentation.

*Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 406–07, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 836 (1958), quoting 3 Restatement (First) of Torts, § 525, at 59. "[T]he elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff," *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966 (2d Cir.1987). Columbia has alleged that Chase deliberately arranged for the double counting (as inventory and as an account receivable) of the scrapped shipped aboard the *Ocean Wind*, and then deliberately marked up the inventory over the course of the next year in order to partly reduce the discrepancy. Although this states a claim for breach of the seller's warranties about Witte Chase's assets under the contract, it also states a claim for fraud, *i.e.*, material misrepresentations about the worth of Witte Chase made in financial statements submitted to Columbia before the signing of the Agreement in order to induce Columbia to purchase the shares for a higher price. "The present action is in tort, not contract, depending not upon agreement between the parties, but rather upon deliberate misrepresentation of fact, relied on by the plaintiff to his detriment," *Channel Master*, 4 N.Y.2d at 408, 176 N.Y.S.2d at 263, 151 N.E.2d at 837. Misrepresentations in the financial state-

ments shown to representatives of Columbia prior to the signing of the Agreement do not relate to the plaintiffs' intent to perform promised by the Agreement. Columbia's claim for breach of the Sellers' guaranty as to the worth of Witte Chase is barred by the two-year limit agreed to by the parties,· but Columbia's claim for fraudulent inducement is not.

■ "[A] contracting party may be charged with a separate tort liability arising from a breach of a duty distinct from, or in addition to, the breach of contract," *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 551, 583 N.Y.S.2d 957, 961, 593 N.E.2d 1365, 1369 (1992), quoting *North Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 22 N.Y.2d 171, 292 N.Y.S.2d 86, 239 N.E.2d 189 (1968). A counterclaim for fraudulent inducement which alleges a misrepresentation of a present fact, not a promise of future intent, which is the inducement for the contract does not duplicate the contract claim and is not barred by the contract. *See RKB Enterprises Inc. v. Ernst & Young*, 182 A.D.2d 971, 972, 582 N.Y.S.2d 814, 816 (3d Dep't 1992) ("Plaintiff's allegations of intentional fraud, however, while also parallel in many respects to the breach of contract claim, do include charges for fraud in the inducement by misrepresentation of a present fact and thus are not merely redundant of the breach of contract claim.") (citations omitted); *Rosen v. Spanierman*, 894 F.2d 28, 35 (2d Cir.1990) ("a claim for fraudulent inducement is separate and distinct from a claim for breach of contract under New York law"); *Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003, 1004 (1986) ("a representation of present fact, not of future intent . . . which was the inducement for the contract. . . . was neither duplicative of the second counterclaim [for breach of contract] nor barred by the general merger clause contained in the contract") (citations omitted).

### B. *Columbia's Contract Claims*

■ Columbia maintains that a careful examination of the contract language reveals that the abbreviated claims period in Section 11 does not apply to all claims of financial misrepresentation or even to all the representations and warranties contained in the Agreement, for the two-year time-to-sue limit applies only to claims arising out of a breach of Section 11. While it is true that New York law requires a court to construe contractual provision limiting the time to sue narrowly, it is also true that a New York court should interpret contract to give effect to the parties' intentions and to all portions of their agreement.

■ The provisions of Section 11(b) require that "any representation or warranty contained herein" be read to refer to representations contained anywhere in the Agreement. Columbia's argument that "herein" refers only to Section 11 is untenable. "Herein" and "hereof" are used throughout the document to refer to the entire Agreement, *e.g.* in Section 10, "the Purchaser shall have the right to take such action . . . subject to the provisions set forth in Section 11 hereof." Section 11 provides that all representations of the Agreement not explicitly excluded are covered by the two year bar date, and this Court declines to create contractual ambiguity where none exists.

### III. *Columbia Has Stated A Claim of Fraud*

Chase argues that even if Columbia has made out a claim of fraud apart from its breach of contract claims, that claim fails because Columbia cannot establish "reasonable reliance" upon Witte Chase's allegedly misleading asset statements for three reasons. First, Chase argues that Columbia explicitly disclaimed reliance on isolated asset values by signing an Agreement which contained a written guaranty by the Sellers of Witte Chase's net worth. Second, Chase makes the closely related argument that any misrepresentations it may have made during the negotiation of the Agreement "merged" into the Agreement and are therefore barred by the two-year time to sue limit. Third, Chase maintains that Columbia relied only upon its own independent investigation of the Witte Chase's net worth.

### A. *Disclaimers of Reliance*

■ In New York, if a party explicitly disclaims reliance upon certain representa-

tions, that party cannot sue on those representations even if they later turn out to be fraudulent. *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 320–21, 184 N.Y.S.2d 599, 602, 157 N.E.2d 597 (1959). ("plaintiff has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded.... a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations").

> [T]he rule that fraud in the inducement vitiates a contract [is] subject to exception where the person claiming to have been defrauded has by his own specific disclaimer of reliance upon oral representations himself [has] been "guilty of deliberately misrepresenting [his] true intention."

*Citibank N.A. v. Plapinger,* 66 N.Y.2d 90, 94, 495 N.Y.S.2d 309, 311, 485 N.E.2d 974, 976 (1985) (quoting *Danann,* 5 N.Y.2d at 323, 184 N.Y.S.2d at 602, 157 N.E.2d at 600) (corporate owners and officers held to "absolute and unconditional" guaranties to banks as part of restructuring of indebtedness of corporation). *See also Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729 (2d Cir.1984) (seller's extensive disclaimers, including a disclaimer of "of the implied warranties of title, merchantability and fitness for intended use" on new design for bus effective against buyer's suit alleging misrepresentations about design where seller did reveal to buyer tests were not complete).

■ However, asking for a seller's guaranty or its representations of the worth of the company does not amount to a disclaimer and the guaranty here most certainly does not look like one. The buyer in *Danann* explicitly took the building "as is" without any warranties, representations, or promises of any kind. Here, by contrast, Columbia did not merely rely upon Chase's representations; it asked Chase to guarantee them. In Section 11(b) of the Agreement, the sellers guaranteed "that the net worth of the Company computed in accordance with Section 9 after removal of the Excluded Assets will be at least $2,350,000, as of February 28, 1987." The language in the Agreement in the case at bar is the opposite of the explicit disclaim-

ers under consideration in *Danann* and *Citibank.*

## B. *Contract Merger Clause*

■ Chase's second argument fails as well. A statement in a contract that the written instrument embodies the whole agreement and that all prior understandings between the parties merge into the written agreement merely prevents one party from alleging oral misrepresentations which directly contradict the language of the agreement signed by the party. The "merger" clause in Section 14(c) of the Agreement is only contractual boilerplate which states that the Agreement "contains the complete agreement of the parties and supersedes all prior agreements and understandings between the parties relating to the subject matter of this Agreement." This cannot be stretched into an acknowledgement that Columbia was not relying on any representations made by the Plaintiffs concerning the financial condition of Witte Chase.

> Although defendants aver that they were fraudulently induced into executing the relevant documents based upon Dreamstreet's alleged oral representations regarding the repayment terms, such proof, even if sufficient to establish fraud ... is barred by the parol evidence rule where, as here, a written provision in the relevant document, i.e., the notes, contradicts the alleged oral representation "in a meaningful fashion."

*DH Cattle Holdings Co. v. Reno,* —— A.D.2d ——, ——, 601 N.Y.S.2d 714, 716–17 (3d Dep't 1993) (oral misrepresentations that payments due on investors' promissory notes would be made solely from income from investment or sale of surplus cattle contradicted by written full-recourse notes). The alleged misrepresentations are not contradicted by the Agreement, and a merger clause as general as this is ineffective to exclude evidence of fraud in the inducement. *Citibank,* 66 N.Y.2d at 94, 495 N.Y.S.2d at 311, 485 N.E.2d at 976 (distinguishing general merger clauses from specific disclaimers).

### C. *Actual Reliance*

Chase's third ground is that Columbia did not rely upon financial statement supplied by it but upon the reports prepared by Witte Chase's and its own accountants. Chase alleges that it gave both sets of auditors access to all company records, and that Columbia purchased Witte Chase in reliance upon the financial statements they created pursuant to the Agreement. Chase also alleges that it gave Columbia complete access to the Port Newark facility and to Witte Chase's records both before and after the Agreement was executed, and in the Agreement Columbia acknowledged that it had "inspected the inventory and equipment on hand at the Company's Port Newark Yard," Section 6 of the Agreement.

> Where sophisticated businessmen engaged in major transactions enjoy access to critical information, but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.

*Grumman,* 748 F.2d at 737.

However, Columbia alleges that the records of Witte Chase which induced the purchase were precisely the records which Chase altered in order to perpetrate the fraud. For this reason, the cases cited by Columbia are inapposite: all involve situations where the party alleging fraud had been informed, or easily could have informed itself, of the facts allegedly misrepresented. In *Grumman,* the court found that "records accurately disclosing the defects that surfaced during testing were turned over to Grumman," and that "in light of undisputed evidence demonstrating that Grumman enjoyed unfettered access to Flexible's plants, personnel and documents [and] that it possessed the legal, technical and business expertise necessary to make effective use of that access," the purchaser could not have justifiably relied upon the alleged misrepresentations, *Grumman,* 748 F.2d at 733, 737. In *Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 524 F.2d 275, 282–83 (2d Cir. 1975) (dismissing allegations of stock manipulation), the court found that "the purchase of Frigitemp shares by the Funds in substantial amounts were not concealed. The appellants discovered from a perusal of available transfer sheets much later what they could have discovered at the time—that the Funds had purchased a large number of shares. Since the appellees had a right to assume that the volume of their purchases was known to appellants, there was no reason for them to disclose the fact."

Although Columbia did do some inspection of Witte Chase's inventory on its own, it has alleged that the principals of Witte Chase deliberately violated generally accepted accounting procedures in order to inflate its assets, presented its financial statements in such as way as to conceal the fraud, and made mysterious adjustments over the course of the next year to minimize the effect of the inventory shortfall the fraud had created. Columbia has presented factual issues about what the principals of Witte Chase did in 1987 and 1988 and what materials Columbia reasonably relied upon in purchasing its interest in Witte Chase. In short, the issues raised by Columbia preclude granting Chase summary judgment on Columbia's first six counterclaims.

### *Conclusion*

For the foregoing reasons, Chase's motion for summary judgment on Columbia's first through sixth amended counterclaims is hereby denied.

It is so ordered.