**PACESETTER MOTORS, INC.,**
**d/b/a Irondequoit Nissan,**
**et al, Plaintiffs,**

v.

**NISSAN MOTOR CORPORATION**
**IN U.S.A., et al, Defendants.**

**No. 93–CV–6205L.**

United States District Court,
W.D. New York.

Jan. 30, 1996.

Andrea R. Moore, Jaeckle, Fleischmann & Mugel, Buffalo, NY, for Pacesetter Motors, Inc., Angelo Ingrassia, Vincent Pelligrino.

Flor M. Colon, Nixon, Hargrave, Devans & Doyle, L.L.P., Rochester, NY, Dennis LaFiura, Pitney, Hardin, Kipp & Szuch, Florham Park, NJ, for Nissan Motor Corporation in

**176**

U.S.A., Nissan Motor Acceptance Corporation.

James P. McElheny, Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, NY, for Hart–Taylor Lincoln–Mercury, Inc.

. James P. McElheny, Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, NY, for Hart–Taylor Lincoln–Mercury, Inc.

## DECISION AND ORDER

LARIMER, Chief Judge.

This is a commercial dispute between the owners of an automobile franchise ("Pacesetter") and the Nissan Motor Corporation ("Nissan") as well as Nissan's related financing company, Nissan Motor Acceptance Corporation ("NMAC"). Pacesetter's controlling shareholders, Angelo Ingrassia and Vincent Pellegrino ("plaintiffs"), assert that they were injured and suffered damages as the result of actions taken by Nissan and/or NMAC in response to plaintiffs' attempts to sell or move the Pacesetter dealership. Presently before me is Nissan and NMAC's joint motion for summary judgment. For the reasons set forth below, I grant defendants' motion and dismiss the complaint in its entirety.

### BACKGROUND

In 1988 Ingrassia and Pellegrino acquired controlling interests in Pacesetter Motors, a Nissan dealership then located at 250 Lake Avenue, Rochester, New York. Soon thereafter they began looking for an alternative site to move the dealership. The 250 Lake Avenue address was unfavorable, in their view, because both the facility and the surrounding neighborhood were rapidly deteriorating, resulting in decreasing sales. In accordance with the Sales and Service Agreement (the "Agreement"), whose provisions governed the relationship between Pacesetter and Nissan, any move or change in ownership was contingent upon Nissan's consent. Such consent was not to be "unreasonably" withheld.

In September 1988 plaintiffs entered into a contract to purchase a vacant lot located at 785 Ridge Road in Webster, New York, a suburb of Rochester. Plaintiffs intended to move the dealership to this new site. The contract to purchase the lot contained two relevant contingencies: approval by Nissan and approval by Marine Midland Automotive Financial Corporation. There was no other contingency for financing with NMAC or any other financial institution. Nissan did approve the move but plaintiffs believed that they needed mortgage financing before they would be able to build a new facility and complete the move. Therefore, at some time after September 1988, plaintiffs contacted NMAC to discuss financing the purchase and relocation of the dealership.

Plaintiffs discussed their financial needs with Frank Keenan, the NMAC Boston regional representative. Both sides apparently were enthusiastic about being able to work toward an acceptable financing arrangement.

Plaintiffs assert that during these weeks of negotiating an oral agreement was reached that NMAC would provide financing, on the terms discussed between plaintiffs and Keenan. On July 25, 1989, Keenan sent to NMAC's Credit Committee (the national body ultimately responsible for all financing decisions) a written request and recommendation for financing the Pacesetter relocation. The Credit Committee made its conditional offer of financing by letter dated August 14, 1989.

The terms of the August 14th offer apparently differed in part from the terms discussed between plaintiffs and Keenan. While the substance of the financing offer was substantially the same, certain conditions contained in the August 14th offer were unacceptable to plaintiffs. Despite continued attempts to reach a satisfactory agreement, plaintiffs refused to accept NMAC's offer of financing on NMAC's terms.

Unfortunately for plaintiffs, on May 31, 1989 they had signed an addendum to their sales contract, committing to close on or around July 30, 1989. In fact, plaintiffs' closed on August 10, four days *before* receiving NMAC's written financing offer. In order to close, plaintiffs borrowed from family and business acquaintances. Plaintiffs allege that they closed prior to obtaining the written offer from NMAC only because they had

received oral assurances from Keenan that financing would be forthcoming, on the terms discussed. Due to the lack of NMAC (or any other) financing, the Webster relocation never occurred.

Following this failed attempt to relocate, plaintiffs then began negotiating to sell the dealership. In April 1991 they successfully negotiated a buy/sell agreement with Michael Piehler ("Piehler"), a well established businessman who already owned a large and successful automobile dealership (offering several different makes) on Lake Avenue not far from the Pacesetter site. Piehler offered $500,000 for the franchise.

Although Nissan was initially interested in approving the sale, ultimately it did not. Nissan's stated reason for its denial was the proximity of Piehler's dealership (2 and ½ miles) to another already existing Nissan dealership—Hart Taylor Nissan. Nissan asserts that it did not want two dealerships so close together and that its refusal to approve the sale was within its contractual rights under the Agreement.

Plaintiffs assert that Nissan's "proximity" argument is but a pretext and that the real reason for Nissan's refusal to approve the sale was Nissan's frustration and anger with Pacesetter.[1]

The next year, in July 1992, plaintiffs sold Pacesetter to another Nissan dealership—Eastway Nissan—for $250,000. For this Nissan-approved sale, plaintiffs received roughly one-half what Piehler had offered them.

### PACESETTER'S COMPLAINT

The complaint sets forth 4 causes of action. The first is that Nissan wrongfully refused to approve the sale of Pacesetter to Piehler. The second claim is that Nissan wrongfully interfered with plaintiffs' contractual relationship with Piehler. The third claim is that Nissan and/or NMAC wrongfully refused to finance the Webster lot purchase. The fourth claim is that Nissan and/or NMAC fraudulently induced plaintiffs to close on the Webster lot contract, at significant personal expense, knowing that NMAC would not provide financing.[2]

### SUMMARY JUDGMENT STANDARDS

Summary judgment may be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating that there is no evidence to support the nonmoving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp., supra,* at 324, 106 S.Ct. at 2553. "The nonmovant . . . 'may not defeat a motion for summary judgment merely by pointing to a potential issue of fact; there must be a genuine issue of material fact.' " *Moller v. North Shore University Hospital,* 12 F.3d 13, 15 (2d Cir.1993) (quoting *City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 45 (2d Cir.1988)).

Additionally, a motion for summary judgment made after an adequate time for discov-

---

**1.** Although not directly relevant to the present motion, subsequent to the failed Webster relocation and roughly contemporaneous with the Piehler negotiation, the plaintiffs had relocated the dealership temporarily to yet another site— an existing Dodge dealership in Irondequoit, New York. Because this relocation was for a three year term only, plaintiffs continued to look for a permanent solution.

**2.** Originally, a 5th claim was alleged, for antitrust violations by Nissan, NMAC, and an additional defendant, Hart Taylor Nissan. By stipulation filed May 10, 1995 plaintiffs voluntarily dismissed this 5th claim and all claims against defendant Hart Taylor Nissan.

ery requires the party with the burden of proof at trial to come forward with proper evidence and "make a showing sufficient to establish the existence of [each] element of that party's case ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp., supra,* at 322–23, 106 S.Ct. at 2552.

## NISSAN AND NMAC'S MOTION FOR SUMMARY JUDGMENT

Nissan and NMAC originally moved for summary judgment in February 1994. After being completely briefed and argued, that motion was continued pending completion of discovery. *See* Order dated June 20, 1994. Following nearly one year of additional discovery, and the dismissal of plaintiffs' 5th claim (as well as defendant Hart Taylor Nissan), Nissan and NMAC have now renewed their motion and seek dismissal of the four remaining causes of action.

### A. Count 1—Refusal to Approve the Sale to Piehler.

Nissan denied approval of the sale of Pacesetter to Piehler allegedly because Piehler's dealership was located too close to Hart Taylor Nissan. Nissan perceived this proximity of two competing dealerships to be inappropriate. According to Nissan, "this clustering of dealerships is not consistent with [Nissan's] long-term market representation plan in Rochester, NY." Letter from Nissan to Ingrassia, May 3, 1991 (denying approval of the Piehler sale).

Nissan asserts that this determination was well within its contractual rights under the Agreement, which provides that any change in dealer ownership "requires the prior written consent" of Nissan (Agreement at Art. 3), and also that "[Nissan] has the right and obligation to evaluate each prospective dealer, its owner(s) and executive manager, *the dealership location* and the dealership facilities to ensure that each of the foregoing is adequate to enable Dealer to meet its responsibilities hereunder." (Agreement—Standard Provisions, at § 15) (emphasis added).

Plaintiffs acknowledge that Nissan could reject a transfer of the franchise but they rely on that portion of the Agreement which provides that Nissan shall not "unreasonably withhold its consent" to any change in ownership. (Agreement at Art. 3). Plaintiffs contend that Nissan was unreasonable in the rejection. Plaintiffs contend that "proximity" is not a valid criterion for denying approval. Plaintiffs assert that if Nissan really intended "proximity" to be an important criterion, it would have said so explicitly. Rather, plaintiffs assert that Nissan's "proximity" argument is just a pretext and that Nissan "refused to approve the Piehler buy/sell simply because Nissan was tired of processing Pacesetter's paperwork and wanted to demonstrate that they were the ones calling the shots." Declaration of Angelo Ingrassia, dated July 4, 1995, at ¶ 48.

The issue here is whether Nissan acted within its rights under the Agreement. By the Agreement's own terms, the rights and obligations of the parties thereunder are to be governed by California law. *See* Agreement—Standard Provisions, at § 17, subpart F. ("This Agreement shall be deemed to have been entered into in the State of California, and all questions concerning the validity, interpretation or performance of any of its terms or provisions, or of any rights or obligations of the parties ... shall be governed by and resolved in accordance with the internal laws of the State of California. . . .")

By statute, California law restricts an automobile franchisee's ability to assign the franchise without the franchisor's consent. However, the statute requires that consent "not be unreasonably withheld."

> There shall be no transfer or assignment of [a] dealer's franchise without the consent of the manufacturer or distributor, which consent shall not be unreasonably withheld. California Vehicle Code, § 11713.3(e).

Thus, California has codified the standards independently agreed upon by Pacesetter and Nissan.

■ In a recent decision, the United States Bankruptcy Court for the Northern District of California interpreted the California statute (apparently for the first time by

any court) for the specific purpose of determining "the legal standard upon which the reasonableness of a manufacturer's withholding consent is to be judged." *In re Van Ness Auto Plaza, Inc.*, 120 B.R. 545, 546 (N.D.Ca. 1990). The Bankruptcy Court concluded that an automobile franchisor's refusal to consent to assignment of a franchise must be supported by more than a subjective claim of good faith. Withholding consent must be supported by substantial evidence showing that the proposed buyer is materially deficient in one or more appropriate, performance related criteria. *Id.* This standard has been subsequently adopted by the United States District Court for the Central District of California. *See In re Claremont Acquisition Corp., Inc.*, 186 B.R. 977, 985 (C.D.Cal.1995) ("the standard of reasonableness elaborated in *Van Ness* is an appropriate one ... and this Court agrees with that decision.")

■ The *Van Ness* court further stated that a reviewing court should not substitute its judgment for that of the manufacturer/distributor, but only look for a substantial basis for its determination. *Van Ness, supra*, at 548.

■ Moreover, while the "burden of presenting plausible reasons for the refusal to consent must be on the manufacturer ... [t]he ultimate burden of persuasion ... is on the dealer to establish that the manufacturer's refusal to consent is unreasonable." *Id.* at 548 (citations omitted).

On its motion for summary judgment, therefore, Nissan must be able to demonstrate the reasonableness of its decision. However, because Nissan's motion has been brought after substantial discovery, in order to defeat it plaintiffs must be able to establish the existence of each element of their case. *Celotex Corp., supra*, at 322–23, 106 S.Ct. at 2552–53. With respect to this first cause of action, I believe Nissan has succeeded in its task and plaintiffs have failed.

■ Pursuant to the terms of the Agreement, Nissan clearly possessed the right to evaluate any proposed sale in accordance with what Nissan deemed to be its best interests. "Location" was expressly stated as being a criterion relevant to Nissan's determination that a prospective buyer could meet its obligations under a franchise agreement. The Agreement is clear and unambiguous on its face in this regard. Thus, because the Agreement is unambiguous "its proper interpretation is a question of law that may be resolved by the Court on summary judgment." *Gomez v. Local 144, et al.*, 1995 WL 731628, *3 (S.D.N.Y.1995) (citing *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir.1992)).

■ I find Piehler's location, including its proximity to the Hart Taylor Nissan dealership, to be a legitimate, performance related criteria, pursuant to the terms of the parties' Agreement.

There is no factual dispute that approximately 2 and ½ miles separates the Piehler dealership and the Hart Taylor Nissan dealership. Plaintiffs themselves have in the past conceded that being too close to another Nissan dealership makes sales more difficult. Pacesetter Relocation Proposal, Ex. 4 to Affidavit of Dennis LaFiura (citing the proximity of Hart Taylor Nissan—4½ miles away—as one of the causes of Pacesetter's declining sales). Thus, I find that Nissan's refusal to consent to the Piehler sale was substantially supported by an "appropriate, performance-related criteria." *Van Ness, supra*, at 548.

Plaintiffs' contentions to the contrary are not persuasive. First, I find no merit to their allegation that proximity was not a valid criterion for making a determination to approve a dealership sale. Such an interpretation of the contract is badly strained. Plaintiffs offer no basis to distinguish "proximity" from "location" in this context, and I will not find ambiguity where there reasonably is none. *See, e.g., Kanter v. Feature Enterprises, Inc.*, 1993 WL 267373, *2 (S.D.N.Y.1993) ("Ambiguity cannot be found where the contract has a definite meaning, nor by '[s]training a contract's language beyond its reasonable and ordinary meaning.'") (citing *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 149 (2d Cir.1993)).

Nor is there anything in the record to support plaintiffs' conclusory allegation that Nissan's true motivation for the rejection

was driven by frustration or a desire to demonstrate "that they were the ones calling the shots." Conclusory allegations such as these are not enough to defeat summary judgment. *See Steinborn v. Daiwa Securities America, Inc.,* 1995 WL 761286, *2 (S.D.N.Y.1995).

Indeed, even if the relationship between plaintiffs and Nissan had become strained by this point in time (although that is not apparent from the record), it would make more sense that Nissan would be eager to sever the relationship with them and to deal with Piehler. And in any event, it would make no economic sense for Nissan to refuse to approve a sale that would be in its best financial interest, due to some personal "frustration" with plaintiffs.

Thus, despite ample discovery, plaintiffs fail to offer any evidence to credibly impugn the reasonableness of Nissan's determination. I find plaintiffs' allegations wholly unsupported and Nissan's refusal to consent to the Piehler sale "not unreasonable." Nissan is entitled to summary judgment on this claim.

### B. Count 2—Interference with Contractual Relationship With Piehler.

Nissan asserts that this claim must be dismissed because Nissan's actions denying the Piehler sale were based upon the long-range economic interests of Nissan in the Rochester area market, and not any improper motive that would provide the legal basis for an intentional-interference claim.

■ The parties agree that in order for a court to find intentional interference with a contractual relationship, the offending party must have acted "with the sole purpose ... of harming the plaintiff or by means that are dishonest, unfair or in any other way improper." *See Sutton Import–Export Corp. v. Starcrest of California,* 762 F.Supp. 68, 71 (S.D.N.Y.1991). Thus, if Nissan acted in its own interests, it cannot be found to have tortiously interfered with plaintiffs' contract with Piehler. *See American Protein Corp. v. AB Volvo,* 844 F.2d 56, 63 (2d Cir.) ("an individual with an economic stake in the business of another may interfere with a contract

that the other business has with a third person if the purpose is to protect the individual's own stake"), *cert. denied,* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988).

Plaintiffs assert, however, that Nissan has presented no proof that it acted to protect its own economic interests. Plaintiffs assert that Nissan's decision was made because Nissan was "frustrated" with Pacesetter.

■ Although questions involving motive are sometimes inappropriate for summary judgment (*see Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988)), summary judgment is not inappropriate where the opponent offers nothing more than a conclusory statement in opposition. *See Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.) ("the summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion"), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

■ Here, as with Count I, plaintiffs have offered no evidence to support their assertion that Nissan's determination was motivated by anything other than protecting its own economic interests. They offer only conclusory allegations that Nissan's motives were improper. This is not enough.

As set forth above, it does not make sense that Nissan would deny approval out of any other motive than Nissan's best economic interests. As both parties recognized, it was in everybody's interest to move the Pacesetter dealership from the Lake Avenue address. I find no evidence in the record to suggest that Nissan was motivated by anything other than appropriate economic concerns. Thus, Nissan's motion for summary judgment is granted as to plaintiffs' second cause of action.

### C. Count 3—Refusal to Finance the Webster Project.

Nissan and NMAC move for summary judgment dismissing this claim on the grounds that NMAC did, in fact, offer plaintiffs a financing package but that the plaintiffs rejected it because they refused to comply with its conditions. Thus, Nissan and

NMAC assert that they never breached any agreement and this claim should be dismissed. I agree.

■ First of all, the claim against Nissan must be dismissed. Even from plaintiffs' perspective, all of the evidence discussed here relates to plaintiffs' relationship with NMAC, not Nissan. Plaintiffs have offered no evidence that Nissan had any obligations whatsoever with respect to NMAC's financial dealings with plaintiffs. Nissan and NMAC are separate entities and there is no evidence that Nissan participated in any formal manner in considering plaintiffs' application for financing from NMAC. Therefore, this cause of action concerning Nissan must be dismissed.

The claim against NMAC must also be dismissed. Plaintiffs do not dispute that they never agreed to the written offer of financing proposed in NMAC's August 14, 1989 commitment letter. Plaintiffs' present theory, on this count, is that NMAC "breached" an oral agreement made sometime in "early 1989" between NMAC's representative, Frank Keenan, and plaintiff Ingrassia.

According to Ingrassia, he and Keenan discussed the specific terms of the financing, including a $1 million mortgage, a "fair" interest rate, personal guarantees by Ingrassia and Pelligrino, and a capital infusion by plaintiffs in the amount of $370,000.00. According to Ingrassia, Keenan orally assured Ingrassia that NMAC would provide the financing on the terms discussed.

The August 14th written offer—made upon final approval from the national Credit Committee—offered essentially the same financing but with some different conditions. The most dramatically different condition was that $550,000 in unencumbered funds be infused into the dealership by plaintiffs. This was a condition that allegedly made the proposal impossible for the plaintiffs to meet. Because the terms of the August 14, 1989 proposal were different, in this respect, from those discussed between Keenan and the plaintiffs, plaintiffs assert that NMAC breached the prior oral contract.

NMAC asserts that no oral agreement was ever made. Alternatively, NMAC argues that even if an oral understanding were reached between Keenan and Ingrassia in the weeks prior to the August 14th letter, it is unenforceable for three reasons: doing so would violate the Statute of Frauds; any such agreement lacked specific terms and thus was too vague to be enforced; and any such agreement was merged into the final, written proposal of August 14, 1989.

Although I am not convinced that any "agreement" was made between Keenan and Ingrassia, even had there been such an agreement, it is unenforceable under the Statute of Frauds.

First of all, at best, it appears that Keenan and Ingrassia talked in general terms about the nature of the financing. Both Keenan and Ingrassia, experienced businessmen, may have been hopeful and optimistic that a deal could be achieved, but the exact arrangement does not appear to have been finalized. All the facts and inferences suggest that plaintiffs knew and understood that NMAC would memorialize the arrangement in a written commitment.

Ingrassia telephoned Keenan several times during the week before the closing in order to obtain written confirmation. "[P]rior to [the closing] I kept asking them when will I have the letter.... I was concerned not having the letter up front." Ingrassia Depo. at pp. 91–92. Obviously, plaintiffs were not comfortable closing on the sale without having written financing approval.

Plaintiffs are not unsophisticated individuals. They are experienced businessmen who have borrowed money from financial institutions in the past. Written commitments for financing are the norm. As such, their alleged reliance on any financing commitment prior to having it in writing is unreasonable and highly risky, if financing from NMAC was truly crucial.

Moreover, I am troubled by plaintiffs' current assertions because they are not entirely consistent with the assertions in their earlier opposition to NMAC's original motion for summary judgment.

In their earlier opposition, plaintiffs did not assert that NMAC breached the oral agreement allegedly made prior to the Au-

gust 14th written offer. The gist of their earlier opposition was that, for several months *after* making their August 14, 1989 financing proposal, NMAC impeded the plaintiffs' ability to comply with its terms, thus allowing NMAC to renege on its offer. As stated in their earlier memorandum of law—

> [t]he letter of August 14, 1989 ... speaks for itself in establishing the threshold agreement on the part of NMAC to extend mortgage and capital financing to plaintiffs. What is at issue thereafter is whether the actions of the Nissan Defendants ... precluded plaintiffs from complying with the conditions either of the loan or of Nissan's conditions for relocating the Franchise to 785 Ridge Road, thus rendering the subsequent refusal to disburse the loan proceeds a breach of the letter agreement. (Plaintiffs' Brief in Opposition, p. 24, filed March 22, 1994).[3]

While discovery can certainly shift the focus of a legal position, the change in the plaintiffs' position appears to be a wholesale revision of the basic claim. I find that plaintiffs' marked change of theory undermines the persuasiveness of their present contentions.

■ But, in any event, I find as a matter of law that the alleged oral understandings between Keenan and Ingrassia are unenforceable under the Statute of Frauds.

The alleged oral agreement primarily was for a $1 million loan secured by a mortgage on the Webster property. While the financing package also included a line of wholesale credit for new and used vehicles, the plaintiffs' primary concern was receiving the cash mortgage loan: it was the key to their being able to close the deal and relocate the dealership. "[T]he [p]rimary focus of what we wanted from [NMAC] was the mortgage. That was our primary focus, the mortgage." Ingrassia Depo. at p. 92.

With respect to the mortgage loan, even if an oral agreement were found to exist, New York's Statute of Frauds would render it unenforceable. *See* New York General Obligations Law § 5–703(1) (An ... interest in real property ... cannot be created, granted, assigned ... unless by ... conveyance in writing).

■ Under New York law, mortgages are considered to be conveyances of interests in real property within the meaning of this subdivision. *See Kolbe v. Projects & Joint Ventures Intern., Inc.*, 186 A.D.2d 988, 588 N.Y.S.2d 451 (4th Dep't 1992) (a mortgage is a conveyance of an interest in real property and therefore falls within the ambit of the Statute of Frauds); *see also Huntington Towers, Ltd. v. Franklin Nat. Bank*, 559 F.2d 863, 871 (2d Cir.1977) ("a contract to give a mortgage is a contract for the sale of an interest in real property" and thus governed by the Statute of Frauds), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978); *U.S. West Financial Services, Inc. v. Tollman*, 786 F.Supp. 333, 341 (S.D.N.Y.) ("An agreement to provide a mortgage—such as the alleged oral agreement to finance [certain real property]—is a conveyance of an interest in real property and therefore subject to the statute of frauds") (citations omitted), *reargument denied*, 1992 WL 58863 (S.D.N.Y.1992).

Thus, the alleged oral financing package pertaining to the $1 million mortgage loan could be valid only if written. Even if an oral contract were determined to have been formed, plaintiffs could not enforce it. I find that the Statute of Frauds bars the decisive aspect of plaintiffs' third claim.

■ Nor is NMAC estopped from asserting the Statute of Frauds defense. To establish a claim of promissory estoppel, plaintiffs must demonstrate that NMAC made a clear and unambiguous promise to them, that they reasonably and foreseeably relied upon the promise, and that they suffered an injury as the result of their reliance. *See Cyberchron Corp. v. Calldata Systems Development, Inc.*, 47 F.3d 39, 44 (2d Cir.1995); *Steinborn v. Daiwa Securities America, Inc.*, 1995 WL

---

**3.** *See also* Declaration of Angelo Ingrassia, dated March 16, 1994, at ¶ 9 ("In reliance on the oral and subsequently written approval of mortgage and capital financing, Mr. Pellegrino and I purchased the lot at 785 Ridge Road....") (submitted in opposition to Nissan and NMAC's original motion for summary judgment).

761286, *6 (S.D.N.Y.1995). Additionally, "[t]he doctrine of promissory estoppel as a bar to assertion of a Statute of Frauds defense has been strictly construed to apply only in those cases where 'the circumstances [are] such as to render it unconscionable to deny the oral promise upon which the promisee has relied.'" *Steinborn, supra,* at *6 (citations omitted); *see also, Merex A.G. v. Fairchild Weston Sys., Inc.,* 29 F.3d 821, 825–26 (2d Cir.1994) (unconscionable injury required for promissory estoppel to negate Statute of Frauds), *cert. denied,* —— U.S. ——, 115 S.Ct. 737, 130 L.Ed.2d 639 (1995).

■ I find promissory estoppel inapplicable in these circumstances. Initially, I question whether a "clear and unambiguous promise" was either made or broken. As noted, Keenan may have been highly optimistic about NMAC providing financing to plaintiffs. But such representations were not breached or broken. NMAC *did* offer financing to plaintiffs, just not on the precise terms that plaintiffs preferred.

Further, I do not find plaintiffs' reliance particularly reasonable. As noted above, for two experienced businessmen to close a real estate transaction without having the financing commitment in place is careless and unreasonable.

Furthermore, plaintiffs' injury is not sufficiently unconscionable. Based upon the plaintiffs' relative sophistication in the business world, and their choice to commit to a closing date that was not contingent upon completed mortgage financing, I find that plaintiffs were not unconscionably injured. *See, e.g., Steinborn, supra,* at *6 (lost salary and bonus insufficient injury to invoke promissory estoppel) (summary judgment); *Greenbaum v. Weinstein,* 131 A.D.2d 430, 515 N.Y.S.2d 866 (2d Dep't 1987) (decision to forego purchase of luxury home in reliance on promises of other not sufficient injury to invoke promissory estoppel) (summary judgment); *Cunnison v. Richardson Greenshields Securities, Inc.,* 107 A.D.2d 50, 53, 485 N.Y.S.2d 272 (1st Dep't 1985) (relocating from Toronto to New York City and foregoing other employment offers insufficient injury to invoke promissory estoppel) (reversing Supreme Court's denial of motion to dismiss); *Ginsberg v. Fairfield–Noble Corp.,* 81 A.D.2d 318, 321, 440 N.Y.S.2d 222 (1st Dep't 1981) ("choice to forego current employment because of rosy promises" insufficient injury to invoke promissory estoppel) (reversing Supreme Court's denial of summary judgment).

In addition, plaintiffs have failed to establish that NMAC was the only source for obtaining financing for construction of the facility at the new site. Even if financing on NMAC's terms were not to plaintiffs' liking, no reason has been advanced here as to why financing could not have been obtained from other sources.[4]

### D. *Count IV—Fraudulent Inducement To Close on the Webster Project.*

■ Finally, plaintiffs assert that Keenan's oral representations fraudulently induced them to close on the Webster contract. To recover under a theory of fraudulent inducement, a plaintiff must show: 1) misrepresentation of material fact; 2) falsity of the representation; 3) scienter; 4) reasonable reliance; and 5) damages. *See, e.g., Chase v. Columbia Nat'l Corp.,* 832 F.Supp. 654, 660 (S.D.N.Y.1993); *see also May Dep't Stores Co. v. International Leasing Corp., Inc.,* 1 F.3d 138, 141 (2d Cir.1993). Additionally, in a case arising out of a contract, a plaintiff must show that the defendant breached a duty separate and collateral from the contract between the parties. *Americana Petroleum Corp. v. Northville Indus. Corp.,* 200 A.D.2d 646, 606 N.Y.S.2d 906 (2d Dep't 1994).

This is because the failure to perform promises of future acts, alone, is merely a breach of contract—not a tort. The "failure to perform promises of future acts is merely a breach of contract to be enforced by an action on the contract. A cause of action for fraud does not arise when the only fraud relates to a breach of contract." *Zinaman v. USTS New York, Inc.,* 798 F.Supp. 128, 134 (S.D.N.Y.1992) (citing, *Grant v. DCA Food*

---

**4.** In addition, it appears that this financing deal may run afoul of that part of the Statute of Frauds that bars enforcement of oral agreements which are not to be performed within one year. Gen.Obdig.Law, § 5–701(a)(1).

*Indus.*, 124 A.D.2d 909, 508 N.Y.S.2d 327 (3d Dep't 1986) (S.D.N.Y.1992)); *see also Chase, supra,* at 660 ("While New York law recognizes a cause of action for fraud in the inducement of a contract, this claim cannot be based solely upon the failure to perform the promises of future acts which constitute the contractual obligations themselves").

In other words, to sustain a claim for fraud the alleged fraud must relate to a "present" fact, which is the inducement for the contract (*i.e.,* "my company is debt-free"). A promise of future intent (*i.e.,* "I'll provide certain services as part of this contract") is not separable from the breach of contract claim itself. *See Chase, supra,* at 661. Thus, "[w]hile under New York law an action for fraud will lie where 'a promise [is] actually made with a preconceived and undisclosed intention of not performing it' ... [it] will be dismissed when 'the only fraud charged relates to a breach of contract.'" *Vista Co. v. Columbia Pictures Industries, Inc.,* 725 F.Supp. 1286 (S.D.N.Y.1989) (citations omitted).

"Similarly, statements will not form the basis of a fraud claim when they are mere 'puffery' or are opinions as to future events." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994).

In this case, plaintiffs' allegations of fraud are essentially the same as their allegations of breach of contract. The alleged misrepresentations were about whether NMAC would enter into the financing contract itself, on certain terms, not about a collateral matter such as the financial condition or long term stability of NMAC.

Moreover, although plaintiffs allege that NMAC made oral commitments having "no intention of honoring same" (Complaint at ¶ 54)—they have provided no evidence of this whatsoever. There is no affidavit or deposition testimony to this effect. The only evidence offered by plaintiffs consists of allegations that NMAC failed to honor oral statements made prior to August 14, 1989. While plaintiffs may believe Keenan made "promises" regarding financing which NMAC ultimately did not "keep," such alle-

gations alone are insufficient to sustain a claim for fraud.

Accordingly, I grant the motion for summary judgment as to this claim as well.

### CONCLUSION

For all the above reasons, I hereby GRANT Nissan and NMAC's motion for summary judgment (docket # 47) in its entirety. The complaint is dismissed.

IT IS SO ORDERED.